Not for Publication

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IVANA MATTEO,<br><br>    Plaintiff,<br><br>v.<br><br>RELIANCE STANDARD LIFE INSURANCE COMPANY,<br><br>    Defendant. | Civil No. 18-11450 (ES) (MAH)<br><br>OPINION |

SALAS, DISTRICT JUDGE

Before the Court are cross-motions for summary judgment filed by Plaintiff Ivana Matteo and Defendant Reliance Standard Life Insurance Company pursuant to Federal Rule of Civil Procedure 56.  (D.E. Nos. 15 & 18-1).  Having considered the parties' submissions, the Court decides this matter without oral argument.  *See* Fed. R. Civ. P. 78(b); L. Civ. R. 78.1(b).  For the following reasons, the Court GRANTS Defendant's motion and DENIES Plaintiff's motion.

## I.    BACKGROUND[1]

### A.    Factual Background

This case concerns a challenge to Defendant's denial of Plaintiff's long-term disability ("LTD") benefits pursuant to Sections 502(a)(1)(B) and 502(a)(3)(B) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1132(a)(1)(B) & (a)(3)(B).[2]  (D.E. No. 1 ("Compl."

---

[1]    The Court summarizes the factual and procedural history from Plaintiff's statement of undisputed material facts and Defendant's response thereto (D.E. Nos. 18-3 & 19-3 (together, "Pl. SMF")), as well as Defendant's statement of undisputed material facts and Plaintiff's response thereto (D.E. Nos. 16 & 20-1 (together, "Def. SMF")). Defendant filed, and the parties frequently cite to, the underlying administrative record throughout their statements of fact and briefs.  (D.E. Nos. 15-3 through 15-20 (collectively, "AR")).

[2]    Section 502(a)(1)(B) permits a beneficiary of a covered policy to file suit to recover benefits under the plan's terms.  29 U.S.C. § 1132(a)(1)(B).  And Section 502(a)(3)(B) allows a beneficiary "to obtain other appropriate equitable relief" to redress violations of the plan's terms.  29 U.S.C. § 1132(a)(3)(B).

or "Complaint")).  Medtronic, Inc. employed Plaintiff from 2013 to June 2015 as an Administrative Assistant III, operating in a sedentary capacity.  (Pl. SMF ¶ 2; Def. SMF ¶ 2).  Defendant issued a group long term disability policy to Medtronic (the "Policy"), which provided Plaintiff with LTD insurance under certain conditions.  (Def. SMF ¶¶ 1 & 3).

Pursuant to the Policy, Defendant promised to "pay a Monthly Benefit if an Insured: (1) is Totally Disabled as the result of a Sickness or Injury covered by this Policy; (2) is under the regular care of a Physician; (3) has completed the Elimination Period; and (4) submits satisfactory proof of Total Disability to [Defendant]."  (AR at 18).  "Totally Disabled" and "Total Disability" initially "mean[] that as a result of an Injury or Sickness: . . . during the Elimination Period[3] and for the first 12 months for which a Monthly Benefit is payable, an Insured cannot perform the material duties of his/her Regular Occupation."[4]  (AR at 10).  After twelve months of benefit payments, the definition of "Totally Disabled" and "Total Disability" changes to "mean[] that as a result of an Injury or Sickness: . . . an Insured cannot perform the material duties of Any Occupation."[5]  (*Id.*; *see* Pl. SMF ¶ 8).  In addition, the Policy states that Defendant "consider[s] the Insured Totally Disabled if due to an Injury or Sickness he or she is capable of only performing the material duties on a part-time basis or part of the material duties on a full-time basis."  (AR at 10).  And, after benefits are paid for twelve months, the Policy's "Mental or Nervous Disorders" limitation applies,

---

[3]     The Policy defines the "Elimination Period" as "a period of consecutive days of Total Disability, as shown on the Schedule of Benefits page, for which no benefit is payable.  It begins on the first day of Total Disability."  (AR at 9).  Defendant noted, and the parties do not appear to dispute, that Plaintiff's Elimination Period lasted 26 weeks, extending from April 30, 2015, her date of loss, through October 29, 2015.  (AR at 183 n.1).

[4]     "Regular Occupation" is defined as "the occupation the Insured is routinely performing when Total Disability begins"; however, the administrator must "look at the Insured's occupation as it is normally performed in the national economy, and not the unique duties performed for a specific employer or in a specific locale."  (AR at 10).

[5]     "Any Occupation" encompasses "an occupation normally performed in the national economy for which an Insured is reasonably suited based upon his/her education, training or experience."  (AR at 9).

which provides that "[m]onthly benefits for Total Disability caused by or contributed to by mental or nervous disorders will not be payable beyond an aggregate lifetime maximum duration of twelve (12) months unless the Insured is in a Hospital or Institution at the end of the twelve (12) month period."  (Def. SMF ¶ 12 (quoting AR at 22)).

In the instant matter, Plaintiff stopped working and, pursuant to the Policy, submitted a claim for Total Disability effective June 15, 2016.[6]  (Def. SMF ¶ 4).  Throughout her claim, Plaintiff maintains that she suffers from various symptoms such as fatigue, orthopedic and fibromyalgia-related pain, cognitive dysfunction, headaches, nausea, muscle aches, and other functional limitations that are secondary to, among other diagnoses, Lyme disease, Bartonella, chronic fatigue syndrome, and fibromyalgia.  (Pl. SMF ¶ 3).  In support of her initial application, Plaintiff submitted a statement from treating physician, Dr. Nancy Lentine, D.O., which reflects Plaintiff's primary diagnosis of "[c]hronic [f]atigue," with symptoms of "fatigue, joint pain, headaches [and] palpitations," which first appeared in June 2015.  (Def. SMF ¶¶ 5–6 (quoting AR at 1688); Pl. SMF ¶ 9).

Defendant ultimately approved Plaintiff's claim for long term disability benefits on appeal following an adverse decision.  (*Compare* AR at 3677–82 (first denial dated March 17, 2016), *with* AR at 168–73 (noting reversal of the denial sometime before May 25, 2017)).  Defendant then paid Plaintiff benefits for a limited duration—from December 12, 2015, to December 12, 2016.  (Def. SMF ¶ 9; *see* AR at 168).  On May 25, 2017, Defendant informed Plaintiff of its conclusion "that her disability is caused by or contributed to by a mental or nervous condition and thus benefits are limited to an aggregate lifetime of 12-months."  (AR at 169; *see* Def. SMF ¶ 15 (noting that

---

[6]     A few immaterial dates are unclear based on the parties' submissions, including the day Plaintiff ceased all work at Medtronic, the day she submitted her first claim for disability benefits, and the day she submitted her subsequent claim for benefits beyond the 12-month limitation period.

the same letter also stated that while "[i]t has been determined that [Plaintiff] qualified for benefits under the 12-month Mental or Nervous Limitation, and she has been paid accordingly[,] . . . it was determined that she did not meet the Policy Definition of Total Disability due to a physical condition" (quoting AR at 168))).  Plaintiff appealed Defendant's adverse benefits determination, and this time, Defendant upheld the denial in a letter dated February 27, 2018.  (Def. SMF ¶ 16 (citing AR 182–94)).  Thus, it is undisputed that Plaintiff exhausted her administrative remedies before initiating this action.  (Def. SMF ¶ 48).

Plaintiff submitted various opinions from physicians and specialists to refute Defendant's adverse benefits determination.  (*See* Pl. SMF ¶ 9).[7]

- On February 1, 2016, Dr. Lentine provided a summary of Plaintiff's treatment, conditions, and illnesses.  (*Id.* ¶ 10 (citing AR at 543)).  Dr. Lentine noted that she began treating Plaintiff in September 2009 and continued through 2011 after Plaintiff "tested positive for anaplasma and a co-infection of Lyme called Bartonella." (AR at 543).  Plaintiff sought Dr. Lentine's treatment again in February 2015 for what "[Plaintiff] felt was most likely symptoms associated with [L]yme disease which she had never treated for in the past." (*Id.*; Pl. SMF ¶ 10).  Dr. Lentine further noted that Plaintiff "had experienced some great losses in her life all in a matter of 3 months" and that "[t]he emotional stress most likely awakened the infection." (AR at 543).  According to Dr. Lentine, Plaintiff experienced "severe anxiety and depression, burning in her stomach, . . . severe joint pain in hips, knees, burning in her feet, severe fatigue associated with memory loss, brain fog and word searches, [and] numbness in her hand." (*Id.*).  Dr. Lentine also reported Plaintiff's various subjective complaints and symptoms during follow-up visits on April 18 and 25, 2016, May 2 and 9, 2016, and June 1, 2016.  (Pl. SMF ¶¶ 15–17 (citing AR at 549, 566, 569, 584 & 590)).  Indeed, on May 2, 2016, Plaintiff reported "slightly increased energy and better mental clarity." (AR at 569).  In an August 11, 2016 Medical Source Statement for Plaintiff, Dr. Lentine opined that Plaintiff would need supine rest for 1.5 to 2 hours per day at unpredictable intervals, such that she would be "off task" 25% or more during a typical workday.  (AR at 515).  She also noted Plaintiff's depression and anxiety, as well as her "joint pain, difficulty concentrating, difficulty walking/standing for [a]

---

[7]        The following recitation of Plaintiff's medical evidence is derived from the administrative record and, where appropriate, the parties' statements of undisputed material fact.  Defendant generally denies that this medical evidence supports a finding that Plaintiff is Totally Disabled under the Policy.  (*See generally* D.E. No. 19-3).

long period" and her "need [for] additional time for food preparation daily." (*Id.*).

- Joseph Labriola, D.C., of The Chiro Health Spa of Ramsey, submitted a report dated February 3, 2016, noting Plaintiff's complaints in relation to her acute care beginning in 2012, including "[e]pisodes of severe thoracic pain," "[m]oderate to severe cervico-thoracic spasm," and "[r]ight shoulder pain."  (AR at 4550; Pl. SMF ¶ 14).  Dr. Labriola also noted various objective findings, including but not limited to "[r]educed cervical range of motion in all directions."  (AR at 4550; Pl. SMF ¶ 14).

- Plaintiff began treatment with Dr. David Wertheimer in May 2016.  (AR at 1209; *see also* AR at 636).  On November 5, 2017, Dr. Wertheimer opined that Plaintiff suffers from "severe fatigue, joint pains, body aches, constipation, depression, anxiety, abdominal pain and insomnia."  (AR at 1209).  He further noted that her "symptoms can be attributed to chronic Lyme disease and [its] resultant biochemical/physiological imbalances." (*Id.*).   Finally,   Dr.   Wertheimer   commented   that   Plaintiff's "chronic health problems" would result in her "miss[ing] work on a regular basis (more than 5 days per month)," and noted that "her joint pains, low energy, brain fog and GI complaints would regularly impair her ability to properly perform normal work related tasks and make it difficult for her to obtain work or hold a job."  (*Id.*).

- Plaintiff submitted a report from Dr. Jason Barone, D.P.T., who observed Plaintiff's fatigue and malaise during physical therapy sessions.[8]  (AR at 640).   Dr. Barone also reflected on Plaintiff's report of having Lyme disease.  (*Id.*).

- Dr. George A. Knod, D.O., conducted an independent medical exam ("IME") at Plaintiff's request on or about October 10, 2016.  (AR at 746–54).   Dr. Knod noted that Plaintiff "tolerated the examination without problem and did not express any increased complaints of pain following exam."  (AR at 746; Def. SMF ¶ 20).  He opined that Plaintiff's medical records from Dr. Lentine support a finding of "chronic fatigue with chronic musculoskeletal pain" as well as a "history of fibromyalgia" and a "history of psychological problems . . . includ[ing] anxiety."  (AR at 752–53).  Overall,  Dr.  Knod  concluded  that  Plaintiff's  "chronic  fatigue  with associated cognitive impairment as related by the treating providers and by Ms. Matteo" have resulted in Plaintiff being "unable to perform the material duties of her full time work on a competitive basis."  (AR at 753; *see* Pl. SMF ¶¶ 23–25).

---

[8]      Although Dr. Barone's letter appears undated (AR at 640), Plaintiff submits that he authored the report on October 17, 2016.  (Pl. SMF ¶ 31).

- On December 28, 2016, Drs. Kristine Keane, Psy.D. (a neuropsychologist) and Kathleen A. Boss, Psy.D. (a Psychometrist), assessed Plaintiff as presenting with major depressive disorder and a mild neurocognitive disorder. (Pl. SMF ¶ 27 (citing AR at 796)). Furthermore, Dr. Keane opined that Plaintiff's "cognitive decline is attributed to her multiple medical conditions to include Lyme's disease, meningitis, chronic fatigue and chronic pain. Her chronic depressive and anxiety symptoms have a further deleterious effect on her overall cognitive functions as well as her overall health." (AR at 796–97; Pl. SMF ¶ 27). In addition, Drs. Keane and Boss reported that Plaintiff "endorsed symptoms of depression that fell within the Severe range" and symptoms of anxiety "within the Moderate range." (AR at 824; Def. SMF ¶ 23). They recommended individual psychotherapy for Plaintiff's depressive symptoms. (AR at 826).

- Plaintiff underwent treatment with Dr. Andrew Brief, M.D., P.A., from June 2016 to September 2017. (Pl. SMF ¶ 29). On June 9, 2016, Dr. Brief opined that Plaintiff's "symptoms appear to be related to transfer metatarsalgia to the second toe which is understandable in the context of her having bone loss from the hallux." (AR at 1608). Although Plaintiff had returned to Dr. Brief after right foot surgery three years earlier in 2013 (AR at 1606), he initially did not recommend further surgery. (AR at 1608). He noted that Plaintiff's "great toe was entirely asymptomatic until her recent acupuncture experience." (*Id.*). Thereafter, in November 2017, Dr. Brief indicated that Plaintiff would be scheduling surgery for "a second metatarsal shortening osteotomy and exploration of the second webspace with possible excision of a Morton's neuroma." (AR at 1210–11). He also opined that Plaintiff "has mechanical issues secondary to her original injury" such that "[t]here is a causal relationship to her exertional malaise." (AR at 1211; Pl. SMF ¶ 36). Dr. Brief found these issues to be "significant enough to impact/interfere with her performing full time work on a competitive basis" such that her "performance of working a 40-hour week, five days a week" would be interrupted. (AR at 1211).

- Dr. Daniel Cameron, M.D., M.P.H., P.C., Plaintiff's examining and treating physician since 2016, opined that some of Plaintiff's functional limitations include 20 minutes of sitting, one hour of standing, 20 to 30 minutes of focus/concentration, 5 to 10 minutes of typing, 30 minutes of using a computer mouse, and 10 minutes of walking. (AR at 1213; Pl. SMF ¶ 35). He also noted that Plaintiff "is severely limited in her ability to write" such that she cannot do so for longer than five minutes or two pages "before her hand begins to tingle and go numb." (AR at 1212). Furthermore, Dr. Cameron opined that Plaintiff's "condition is medical and not related to the depression cited in her IME opinion." (AR at 1213).

- Dr. Ritchie Kim, P.T., saw Plaintiff from September 19, 2017, to November 6, 2017. (AR at 1214). He opined that Plaintiff presented with generalized

weakness and fatigue, such that "sustaining a full time occupation would be difficult at the moment and not advisable." (*Id.*; Pl. SMF ¶ 34).

The Defendant retained its own doctors to opine on Plaintiff's overall medical condition and functional limitations. For example, Dr. Abdulhamid Alkhalaf, M.D., an infectious disease physician, opined that Plaintiff's various Lyme-related laboratory tests "showed conflicting data." (AR at 281–92). Dr. Jeremy B. Hertza, PsyD., a psychologist/neuropsychologist, also reviewed Plaintiff's records. He opined that there is insufficient evidence to support Plaintiff's impairment from depression or anxiety because there was a lack of "aggressive treatment" for those notated conditions such that the "frequency of service does not match [Plaintiff's] complaints." (AR at 872; *see* Def. SMF ¶ 35; Pl. SMF ¶ 28). Dr. Hertza ultimately concluded that Plaintiff appeared to have "some level of depression and anxiety . . . although not likely severe." (AR at 872). Dr. Hertza provided an addendum to his March 16, 2017 report noting that Plaintiff's "cognitive profile suggests she will be able to manage all aspects of work, but not likely at the same level she was able to do so previously." (AR at 3494). Thus, while Dr. Hertza opined that Plaintiff may need some supervision and aid to complete certain analytical and problem-solving tasks, he noted that her "[r]outine and more mundane aspects of her occupation will not likely be negatively impacted." (*Id.*).

At Defendant's request, Plaintiff also underwent IMEs with Drs. Jeffrey Liva, M.D., and Eckhardt Johanning, M.D., MSc, Ph.D., on January 11, 2017, and January 26, 2018, respectively. (Def. SMF ¶¶ 26 & 41). After considering all relevant data, including Plaintiff's chief complaints, Dr. Liva opined that Plaintiff is capable of "at least a sedentary work capacity." (*Id.* ¶¶ 27 & 31 (quoting AR at 852)). Dr. Johanning found Plaintiff's primary diagnoses to consist of depression and anxiety with apparent cognitive minor abnormalities, a history of long-term Lyme disease treatments, chronic pain, chronic fatigue syndrome, fibromyalgia, and thyroid disease, among

others.  (*Id.* ¶ 42 (citing AR at 1645)).  While acknowledging Plaintiff's limitations as related to her diagnoses and symptoms, Dr. Johanning found that she could still function at a light exertional level.  (AR at 1631).

### B.    Procedural History

On July 9, 2018, Plaintiff brought the instant action.  The Complaint alleges that Defendant is contractually obligated to provide LTD benefits under the Policy because Plaintiff remains "totally disabled" as of April 2016.  (Compl. ¶ 15).  On August 21, 2018, Defendant filed an answer (D.E. No. 4), and on May 29, 2019, the Honorable Judge Michael A. Hammer, U.S.M.J., held a settlement conference and granted the parties leave to file motions for summary judgment.  (D.E. Nos. 13 & 14).  On July 26, 2019, the parties filed their respective cross-motions (D.E. Nos. 15 & 18-1), which were fully briefed in due course.  (D.E. No. 17 ("Def. Mov. Br."); D.E. No. 18-2 ("Pl. Mov. Br."): D.E. No. 19 ("Def. Opp."); D.E. No. 20 ("Pl. Opp.")).  On March 11, 2020, the Undersigned held a status conference with the parties, during which they consented to mediation. (D.E. Nos. 24 & 25).  At the parties' request, the Court appointed the Honorable Francis J. Orlando, Jr. as mediator.  (D.E. No. 27).  After unsuccessful mediation, the action was reinstated (D.E. No. 29) and the parties renewed their cross-motions for summary judgment.  (D.E. Nos. 33 & 35). After careful consideration of the extensive administrative record, the Court is ready to rule.

## II.    LEGAL STANDARDS

### A.    Summary Judgment

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).  A dispute is genuine if a reasonable jury could find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Entry of summary

judgment is precluded if there are "disputes over facts that might affect the outcome of the suit." *Id.*

On a summary judgment motion, the moving party bears the initial burden of showing that no genuine issue of material fact exists. *Celotex*, 477 U.S. at 323. Once the moving party has met this burden, "the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Cosm. Gallery, Inc. v. Schoeneman Corp.*, 495 F.3d 46, 51 (3d Cir. 2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (internal quotation marks omitted)). At the summary judgment stage, the Court must "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Drumgo v. Kuschel*, 684 F. App'x 228, 230 (3d Cir. 2017) (quoting *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995)).

## B.     ERISA Standard of Review

A denial-of-benefits claim brought pursuant to ERISA is typically reviewed de novo. *Estate of Schwing v. Lilly Health Plan*, 562 F.3d 522, 525 (3d Cir. 2009). But where "the plan grants discretionary authority to the administrator or fiduciary to determine eligibility for benefits or interpret the terms of the plan," as it does here, the Court reviews the administrator's exercise of that authority under an "arbitrary and capricious standard." *Id.*; *see also Miller v. Am. Airlines, Inc.*, 632 F.3d 837, 844 (3d Cir. 2011).[9] This standard applies to both findings of fact and matters of plan interpretation. *Fleisher v. Standard Ins.*, 679 F.3d 116, 121 (3d Cir. 2012).

A decision is arbitrary and capricious "if it is without reason, unsupported by substantial evidence or erroneous as a matter of law." *Miller*, 632 F.3d at 845. Substantial evidence exists

---

[9]     The Policy grants Defendant "the discretionary authority to interpret the Plan and the insurance policy to determine eligibility for benefits." (AR at 14). The parties agree that Defendant's decision to deny Plaintiff's benefits claim should be reviewed under an arbitrary and capricious standard. (Def. Mov. Br. at 2; Pl. Mov. Br. at 9–10).

when there is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Fleisher*, 679 F.3d at 121.  Consequently, a court's scope of review is narrow, and it "is not free to substitute its own judgment for that of the defendants in determining eligibility for plan benefits."  *Quinlan v. Reliance Standard Life Ins.*, No. 13-7052, 2015 WL 519430, at *6 (D.N.J. Feb. 9, 2015) (quoting *Abnathya v. Hoffmann–La Roche, Inc.*, 2 F.3d 40, 45 (3d Cir. 1993)).  "Indeed, a decision may be disturbed only if it was unreasonable."  *Aristone v. N.J. Carpenter's Pension Fund (Plan No. 001)*, No. 15-5709, 2016 WL 4265718, at *6 (D.N.J. Aug. 12, 2016).  Moreover, "deference should be given to the lion's share of ERISA claims."  *Dukes v. Liberty Life Assur. of Boston*, No. 14-0806, 2015 WL 4132975, at *3 (D.N.J. July 7, 2015).

When determining whether the decision to terminate benefits was arbitrary and capricious, a court must focus on the final, post-appeal decision.  *Funk v. CIGNA Grp.*, 648 F.3d 182, 181 n.11 (3d Cir. 2011), *abrogated on other grounds by Montanile v. Bd. of Tr. of Nat'l Elevator Indus. Health Benefit Plan*, 136 S. Ct. 651 (2016).  While a court may consider pre-final decisions as evidence of the decision-making process that yielded the final decision, "those decisions ought merely to inform a court's review of the final decision."  *Id.*  In addition, the Court is limited to evidence that was before the plan administrator at the time of the decision being reviewed. *Aristone*, 2016 WL 4265718, at *2 n.1.

III.   **DISCUSSION**

A.   **The Plan's "Mental or Nervous Disorders" Limitation & the "Any Occupation" Standard**

At the outset, Defendant argues that to overcome the "Mental or Nervous Disorders" limitation, Plaintiff must "prove that she was totally disabled solely as a result of her physical condition or conditions" in order to receive benefits beyond the initial twelve-month period.  (Def. Mov. Br. at 5–8).  The Policy's "Mental or Nervous Disorders" limitation provides that "Monthly

Benefits for Total Disability caused by *or contributed to* by mental or nervous disorders will *not* be payable beyond an aggregate lifetime maximum duration of twelve (12) months unless the Insured is in a Hospital or Institution at the end of the twelve (12) month period." (AR at 22 (emphasis added)).[10]   As such, Defendant argues that Plaintiff's "well documented" depression and/or anxiety cannot contribute to her Total Disability. (Def. Mov. Br. at 5–8). In the same vein, Defendant asserts that the cause of Plaintiff's depression and/or anxiety is immaterial. (*Id.* at 8–9 (first citing *Michaels v. The Equitable Life Assur. Soc'y of U.S. Emps., Managers, & Agents Long-Term Disability Plan*, 305 F. App'x 896, 907 (3d Cir. 2009); and then citing *Gunn v. Reliance Standard Life Ins. Co.*, 399 F. App'x 147 (9th Cir. 2010))). The Court finds *Michaels* instructive and *Gunn* persuasive.

In *Michaels*, the Third Circuit examined a comparable policy limitation, providing that "a period of total disability will end after 24 months of receiving disability benefits if it is determined that the disability arises from or on account of . . . a mental condition described in the most current edition of the Diagnostic and Statistical Manual of Mental Disorders." 305 F. App'x at 903. Critically, the court acknowledged that it would be "plainly unreasonable" to preclude Michaels's benefits beyond the initial twenty-four-month period due to the existence of a mental condition, "notwithstanding the presence of a totally disabling *physical* condition," because that "interpretation would lead to the absurd result of rendering Michaels's physical condition completely irrelevant, as the presence of any mental condition would negate the effect of total physical disability." *Id.* at 903–04 (emphasis added). Ultimately, the Third Circuit held that "for Michaels to receive benefits beyond twenty-four months under [defendant's] Plan, he would have

---

[10]      The Policy defines "Mental or Nervous Disorders" as those that are "diagnosed to include a condition such as: (1) bipolar disorder (manic depressive syndrome); (2) schizophrenia; (3) delusional (paranoid) disorders; (4) psychotic disorders; (5) depressive disorders; (6) anxiety disorders; (7) somatoform disorders (psychosomatic illness); (8) eating disorders; or (9) mental illness." (AR at 22).

to show that, *by itself*, his physical disability precluded him from engaging in any gainful occupation, *regardless of any concurrent mental condition*." *Id.* at 904 (emphasis added). Stated differently, the presence of a mental condition does not preclude a finding of total disability, but it cannot be the sole cause or a contributing cause of disability. In addition, as held in *Michaels*, the source of a claimant's mental condition—*i.e.*, whether it resulted from a physical condition or injury—is irrelevant. *Id.* at 907–08 (noting that although "Michaels's depression and bipolar disorder appear to have been caused, or at least exacerbated, by his physical injury," that fact "does not change the characterization of these disorders as mental conditions").

Notably, the Policy's language is more clear on this issue than the language in *Michaels*. Whereas *Michaels* concerned a policy that said benefits are not payable if "disability arises from or on account of . . . a mental condition," *id.* at 898, the Policy here more clearly says that benefits are not payable for disability "caused by *or contributed to* by mental or nervous disorders." (AR at 22 (emphasis added)). Hence, the Ninth Circuit in *Gunn* reviewed an identical limitation as the one at bar and reached the same result as the Third Circuit. 399 F. App'x at 148 n.4. There, the court upheld the defendant's interpretation of the policy's limitation, requiring that plaintiff show total disability "solely due to his physical condition stemming from his multiple sclerosis, without taking into account the disabling effects of any mental or nervous disorders." *Id.* at 151.

Thus, contrary to Plaintiff's arguments, the inquiry is not whether a mental condition plays a significant, substantial, or material role in Plaintiff's functional limitations or whether her mental impairments are rooted in her physical impairments. (*See* Pl. Opp. at 4–7). Rather, "the Court's task at this stage is to determine whether [Plaintiff] remains totally disabled based on her physical limitations, or, in other words, if her physical symptoms render her disabled regardless of her mental condition." *Watson v. Reliance Standard Life Ins. Co.*, No. 14-4990, 2017 WL 5418768,

at *9 (N.D. Ill. Nov. 14, 2017); *see also Krash v. Reliance Standard Life Ins. Co.*, 248 F. Supp. 3d 600, 613 (M.D. Pa. 2017) ("Any argument by the plaintiff that the limitation does not apply in her case because her mental impairments are caused by her physical impairments is without merit.").

Here, the record supports a finding that Plaintiff's mental impairments cause or, at minimum, contribute to her overall impairments.  For example, after conducting an independent neuropsychological examination, Drs. Keane and Boss found Plaintiff to have major depressive disorder, such that her "chronic depressive and anxiety symptoms have a further deleterious effect on her overall cognitive functions as well as her overall health."  (AR at 825–26).  This finding comports with Dr. Johanning's assessment that "[b]esides the knee and right foot/toe musculoskeletal conditions, other listed conditions are for the most part within the categories of psycho-somatic disorders and illnesses that are difficult to be proven and shown with conclusive evidence."  (AR at 1646).  Indeed, Dr. Johanning listed Plaintiff's "psycho-somatic health disorder[s] (anxiety/depression . . .)" as factors that affect her physical abilities.  (AR at 1668; *see id.* at 1632).  These findings support the conclusion that Plaintiff's mental impairments cause or, at minimum, contribute to her physical impairments.  Thus, the Court cannot find that Defendant's denial of benefits was arbitrary and capricious.

Next, Plaintiff argues that Defendant conflates her "cognitive and/or non-exertional limitations (like pain and fatigue) with 'anxiety and depression' or mental illness."  (Pl. Opp. at 5–7 & 10).  Even if Plaintiff's purported cognitive impairments—such as those associated with chronic fatigue—are distinct and separate from any mental impairments, Plaintiff must show that her physical conditions are the *sole* cause of her disability and preclude her from performing "Any Occupation" as defined by the Policy.  (AR at 9 & 22); *see Krash v. Reliance Standard Life Ins. Grp.*, 723 F. App'x 106, 110 (3d Cir. 2018) ("As the District Court noted, because of the 'mental

or nervous disorders' limitation, in order to remain eligible for benefits past the 24-month mark, 'it was [plaintiff's] burden to prove that she was totally disabled from any occupation solely due to a physical condition.'" (citing *Okuno v. Reliance Standard Life Ins. Co.*, 836 F.3d 600, 607–09 (6th Cir. 2016))); *Michaels*, 305 F. App'x at 903, 907–08.  Plaintiff carries a heavy burden under the "any occupation" standard.  *Rodriguez v. Reliance Standard Life Ins. Co.*, No. 12-4810, 2014 WL 347884, at *3 (D.N.J. Jan. 31, 2014), *aff'd*, 599 F. App'x 423 (3d Cir. 2015) (first citing *Pannebecker v. Liberty Life Assur. Co.*, 542 F.3d 1213, 1219 (9th Cir. 2008); and then citing *Brigham v. Sun Life of Canada*, 317 F.3d 72, 86 (1st Cir. 2003)).  Plaintiff must demonstrate that she cannot undertake "an occupation normally performed in the national economy for which [she] is reasonably suited based upon []her education, training or experience."  (AR at 9).

With respect to Plaintiff's physical conditions—including her Lyme disease, chronic fatigue, fibromyalgia, and orthopedic ailments—Defendant argues that none are disabling; thus, she can perform "Any Occupation."  (Def. Mov. Br. at 10–21).  Plaintiff generally counters that "Defendant never meaningfully considered" the evidence of record during its administrative review.  (Pl. Opp. at 12).[11]  For the reasons discussed *infra*, Defendant's refusal to award Plaintiff benefits was not arbitrary and capricious because the record is insufficient—*i.e.*, the evidence does not support that Plaintiff's physical conditions, standing alone, render her Totally Disabled and thus unable to perform "Any Occupation" under the Policy.  Thus, even crediting Plaintiff's Lyme disease diagnosis, chronic fatigue, and fibromyalgia, the Court agrees that Defendant's conclusion—that Plaintiff can perform sedentary work—was not arbitrary and capricious.  To be clear, "sedentary work" requires "sitting most of the time, but may involve walking or standing

---

[11]     Because many of Plaintiff's specific arguments in opposition overlap with her assertions of procedural conflicts of interest cited in support of her summary judgment motion (*compare* Pl. Opp. at 10–25, *with* Pl. Mov. Br. at 12–31), the Court will address Plaintiff's remaining arguments in Section III.B, *infra*.

for brief periods of time" and "[e]xerting up to 10 pounds of force occasionally and/or a negligible amount of force frequently."  (AR at 185).

Defendant cites numerous physician reports and findings to substantiate its denial of benefits based on Plaintiff's apparent ability to perform sedentary work.  (AR at 182–94, February 27, 2018 Appeal Determination Letter).  For example, in a follow-up visit with Dr. Cameron on January 26, 2017, Plaintiff reported feeling fatigued, but noted that she could undertake more activities during the day.  (AR at 186).  Notably, during this visit, Plaintiff also reported that she returned to part-time employment in mid-January 2017.  (*Id.*).  Between February 27, 2017, and September 25, 2017, Plaintiff continued to see Dr. Cameron and reported having traveled and having experienced busy weekends.  (*Id.*).  During a visit with Dr. Lentine on October 25, 2017, Plaintiff reported her ability to "dress, groom, transfer, eat, and toilet independently and without supervision or physical assistance."  (AR at 187).  Similarly, Defendant noted Plaintiff's report that she can perform many activities of daily living independently, such as personal hygiene-related tasks, dressing, shopping, cooking, and driving, which are consistent with sedentary to light work exertion levels.  (AR at 192).  On September 18, 2017, and October 26, 2017, Plaintiff's treating physicians, Dr. Brief and Dr. Elaine Cong, M.D., did not opine on any of Plaintiff's specific restrictions or limitations.  (AR at 187–88, 1210–11 & 1260–64).[12]  Although Dr. Brief opined that Plaintiff has "mechanical issues secondary to her original [foot] injury," he did not expand upon his conclusion as to how such issues "impact/interfere with her performing full time work on a competitive basis."  (*See* AR at 1210–11).  For example, a review of Dr. Brief's

---

[12]     Moreover, Plaintiff fails to explain how records from Drs. Gary Alweiss, M.D., and Cong support her claim for benefits; in fact, she wholly neglects to summarize findings from these physicians in her submissions to the Court. (*See generally* Pl. Mov. Br. & Pl. Opp.).  And, notably, while Plaintiff maintains that Defendant ignored her evidence (Pl. Mov. Br. at 23), the record reflects otherwise.  (*See, e.g.*, AR at 186–87 (detailing Drs. Alweiss and Cong's findings in Defendant's February 27, 2018 appeal determination letter)).

November 17, 2017 letter reflects no specific details as to Plaintiff's purported limitations or how exactly said limitations impact or interfere with her ability to work full time.  (*See id.*).  Indeed, Dr. Brief indicated that Plaintiff returned to work on March 2, 2017.  (*Id.* at 188).

In addition, Defendant pointed to the occupational IME conducted by Dr. Johanning (AR at 1631–48), who found that, based on a physical exam, medical documentation, and third-party video surveillance, Plaintiff presented with a history of multiple diagnoses, including depression and anxiety, long-term Lyme disease treatments, chronic pain, chronic fatigue syndrome, fibromyalgia, and thyroid disease, among others.  (AR at 188–89 & 1645).  Specifically, Dr. Johanning observed that Plaintiff required "no assistance to move around the office, get in and out of the chair, and get onto the exam table. . . . She was in no apparent acute respiratory or physical distress."  (AR at 1636).  Based on Dr. Johanning's physical exam, Plaintiff's "[r]ange of motion testing of the joints appeared adequate other than reported pain and discomfort in the right wrist with range of motion testing and of the right forefoot . . . . Grip strength on the left and right appeared adequate."  (AR at 1637).  Although Plaintiff could not tolerate straight leg testing beyond 30 to 40 degrees because of reported discomfort and pain, Dr. Johanning noted that Plaintiff "was able to stand freely on one of her feet, or her toes and heels, or walk a line unsupported."  (*Id.*).  Dr. Johanning ultimately opined that Plaintiff could perform sedentary to light work during an eight-hour workday with some limitations: occasional ladder climbing, kneeling, and crawling; frequent standing, walking, and use of upper extremities; light lifting, defined as exerting up to 20 pounds of force on occasion, and up to 10 pounds of force frequently. (AR at 1631–32).  Furthermore, Dr. Johanning noted the following specific restrictions for Plaintiff's employment: "no heavy and repetitive lifting and work that requires prolonged ([greater than] 30 minutes) lower extremity static forces, standing, repetition and complex multitasking of

the lower extremities.   No standing on hard or vibrating surfaces (*i.e.*, cement floors, heavy machinery)." (*Id.* at 1646–47).  Significantly, Dr. Johanning opined that Plaintiff's "ability to talk, hear/listen, and her vision/acuity appear not restricted based on [his] examination." (*Id.*).  These findings are consistent with Dr. Liva's opinion that Plaintiff is capable of "at least a sedentary work capacity." (AR at 852; 856–57).

Defendant also referenced a second psychological/neuropsychological opinion by Dr. Hertza in denying Plaintiff's benefits on appeal.  (AR at 191 & 862–80).  Dr. Hertza opined that while Plaintiff may struggle and need aid to ensure effective problem management, the "[r]outine and more mundane aspects of her occupation will not likely be negatively impacted," and that she had "no limitations that would preclude full time work." (AR at 3493–94).  Finally, after conducting a Residual Employment Analysis ("REA") based on Plaintiff's physical restrictions and limitations,[13] Defendant's vocational specialist opined that Plaintiff qualifies for sedentary occupations such as "Space Scheduler, Appointment Clerk, Order Clerk, Clerk Typist, and Service Clerk." (AR at 191 & 1671–72).

Overall, the Court finds that these physicians' reports were sufficient for Defendant to conclude that Plaintiff no longer met the definition of "Total Disability" after the initial 12-month period because she remained capable of performing sedentary work.  Thus, because of the "level of deference owed to the Plan," Defendant's denial of benefits was not arbitrary and capricious. *See Ryan v. PNC Fin. Servs. Grp., Inc.*, No. 14-1048, 2016 WL 374273, at *5 (W.D. Pa. Feb. 1, 2016); *see also Orvosh v. Program of Grp. Ins. for Salaried Emps. of Volkswagen of Am., Inc.*, 222 F.3d 123, 131 (3d Cir. 2000) (concluding that the district court erred by granting summary

---

[13]      Although Plaintiff argues that the REA failed to consider Dr. Hertza's functional limitations (Pl. Mov. Br. at 14 & 23 n.6), she ignores the vocational expert's addendum dated February 26, 2018, which explicitly incorporates Dr. Hertza's findings.  (AR at 1671–72).

judgment in plaintiff's favor because "although [plaintiff] is no longer able to fulfill the duties of his former job" it appears that "he is capable of securing other gainful employment for which he is reasonably suited"); *Duhon v. Texaco, Inc.*, 15 F.3d 1302, 1307 (5th Cir. 1994) (holding that the claimant was not totally disabled because he remained both capable and "qualified by training, education, or experience" to complete sedentary to light work notwithstanding his inability to perform his former occupation as a truck driver).

**B.     Conflict of Interest Analysis**

**i.     Structural Conflict of Interest**

The bulk of Plaintiff's arguments in support of and in opposition to the instant motions are rooted in alleged conflicts of interest.

In reviewing a denial-of-benefits claim, a court must weigh several different factors, *Estate of Schwing*, 562 F.3d at 526, including both structural and procedural concerns. *Uqdah v. Unum Life Ins. Co. of Am.*, No. 14-6367, 2015 WL 5572678, at *5 (D.N.J. Sept. 21, 2015) (citing *Estate of Schwing*, 562 F.3d at 525–26). A structural inquiry "focuses on the financial incentives created by the way the plan is organized, *i.e.*, whether there is a conflict of interest," and a procedural inquiry addresses "how the administrator treated the particular claimant." *Miller*, 632 F.3d at 845. There is a presumed structural conflict of interest where, as here, the insurance company both reviews claims and pays out benefits. *Estate of Schwing*, 562 F.3d at 526; (Def. Mov. Br. at 5 (acknowledging a presumed conflict of interest in this case)). "The existence of a conflict of interest, however, is not dispositive." *Uqdah*, 2015 WL 5572678, at *5 (citing *Estate of Schwing*, 562 F.3d at 525–27). Rather, it is just one factor that a court must consider when determining whether the administrator was arbitrary or capricious. *Metro. Life Ins. v. Glenn*, 554 U.S. 105, 116 (2008) (holding that "conflicts are but one factor among many that a reviewing judge must take

into account").

Although Plaintiff discusses the standard regarding a structural conflict of interest in her moving brief, she does not explicitly argue that a structural conflict affected her claim. (*See generally* Pl. Mov. Br.). Rather, Plaintiff's submission includes general allegations of bias. (*See, e.g.*, Pl. Mov. Br. at 24 (arguing that "Defendant favored itself at every turn")). However, Plaintiff does not explain where any alleged bias stems from apart from Defendant's own self-serving interests. (*See id.*). Indeed, Defendant's self-serving selectivity is a factor the Court considers under the procedural conflict-of-interest inquiry. And, as noted *infra*, Defendant need not afford greater weight to Plaintiff's treating physicians as opposed to its own independent medical examiners. Thus, as one factor in the Court's determination, the presumed structural conflict of interest does not, standing alone, render the Defendant's denial of benefits arbitrary and capricious.

### ii.    Procedural Conflict of Interest

The Court may consider a variety of factors during its procedural inquiry, including (i) a reversal of a benefits determination without additional evidence; (ii) a disregard of opinions previously relied upon; (iii) a self-serving selectivity in the use of evidence or reliance on self-serving paper reviews of medical files; (iv) a reliance on the opinions of non-treating physicians over treating physicians without explanation; (v) a reliance on inadequate information or incomplete investigation; (vi) failure to comply with the notice requirements of Section 504 of ERISA; (vii) failure to analyze all relevant diagnoses; and (viii) failure to consider Plaintiff's ability to perform actual job requirements. *Uqdah*, 2015 WL 5572678, at *6; *Moustafa v. Reliastar Life Ins.*, No. 15-2531, 2016 WL 6662685, at *7 (D.N.J. Nov. 8, 2016).

Plaintiff argues that the denial of her appeal for LTD benefits was arbitrary and capricious because Defendant (i) disregarded the medical opinion of Dr. Hertza; (ii) used self-serving,

selective evidence; (iii) failed to comply with ERISA's notice requirement; (iv) failed to analyze all of Plaintiff's relevant diagnoses, including "chronic fatigue syndrome, fibromyalgia and cognitive dysfunction"; and (v) failed to consider whether Plaintiff could perform her actual job requirements or other jobs in which her skills are transferable.  (Pl. Mov. Br. at 12).

### 1.    Defendant Considered the Record Evidence

Most of Plaintiff's arguments boil down to one overarching issue: "whether Plaintiff has provided evidence sufficient to convince the Court that Defendant's deference to the opinions of the reviewing physicians, as opposed to Plaintiff's treating physicians, was unreasonable or unsupported by substantial evidence."  *See Ryan*, 2016 WL 374273, at *4.  Akin to the defendant in *Ryan*, a majority of Defendant's support for its denial of benefits was based on the findings of reviewing physicians, as opposed to treating physicians, and its decision would "otherwise be factually weak without said findings."  *Id.*  However, this fact alone is not dispositive because a plan administrator is not required to give greater weight to the opinions of a claimant's treating physicians as compared to those of independent medical examiners.  *Black & Decker*, 538 U.S. 822, 834 (2003);[14] *see also Bluman v. Plan Admin'r & Trs. for CAN's Integrated Disability Program*, 491 F. App'x 312, 315–16 (3d Cir. 2012) (rejecting plaintiff's argument that the administrator erred by relying on the opinion of non-treating doctor who had only reviewed plaintiff's medical records).  Although an administrator may not "refuse to credit a claimant's reliable evidence" (which includes the opinion of a treating physician), the administrator may credit "reliable evidence that conflicts with a treating physician's evaluation."  *Black & Decker*,

---

[14]    In *Black & Decker*, the Supreme Court distinguished ERISA disability cases from social security disability claims, in which the opinions of treating physicians are given great, if not controlling, weight.  538 U.S. at 829–32. The Court acknowledged that treating physicians may have a better opportunity to know and observe the patient over a period of time as compared to one-time consultants, but nevertheless held that "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician."  *Id.* at 829.

538 U.S. at 834; *Stratton v. E.I. DuPont de Nemours & Co.*, 363 F.3d 250, 258 (3d Cir. 2004) (upholding district court's finding that the insurer did not act arbitrarily by refusing to defer to a report from patient's treating physician). In addition, plan administrators are under no "discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Black & Decker*, 538 U.S. at 834. Thus, Plaintiff must produce "evidence sufficient to convince the Court that Defendant's deference to the opinions of the reviewing physicians, as opposed to Plaintiff's treating physicians, was unreasonable or unsupported by substantial evidence." *See Ryan*, 2016 WL 374273, at *4. Plaintiff has not done so here.

Although Plaintiff acknowledges that Defendant had no obligation to weigh her treating physicians' opinions more than its own experts, she maintains that it could not have reasonably denied her benefits without considering her evidence "in any meaningful way." (Pl. Mov. Br. at 13 & 23). The Court disagrees with Plaintiff's assessment. Indeed, Defendant considered the medical opinions of Plaintiff's treating/reviewing providers—Drs. Cameron, Alweiss, Cong, Lentine, and Brief—at length before denying Plaintiff's appeal on February 27, 2018. (AR at 185–91). In addition, Defendant discussed the opinions of Drs. Keane and Boss in its denial letter dated May 25, 2017. (AR at 170).

Moreover, contrary to Plaintiff's contentions (Pl. Mov. Br. at 13–14 & 23–24), Defendant considered Dr. Hertza's findings in both its May 25, 2017 denial-of-benefits letter and its subsequent appeal determination letter. (AR at 171 & 191 (quoting Dr. Hertza's finding that Plaintiff "may struggle and need to ask others to aid in ensuring [that more challenging] problems are managed effectively")). Indeed, Dr. Hertza found that Plaintiff has depression and anxiety but opined that such conditions are not severe because she did not aggressively treat or seek service for correlating complaints. (AR at 871). However, Drs. Keane and Boss, Plaintiff's providers,

recommended individual psychotherapy and psychiatric evaluation based on Plaintiff's endorsed reports of severe depression and moderate anxiety.  (AR at 824–26).  Thus, Defendant's decision to attribute less weight to Dr. Hertza's findings was not arbitrary and capricious, particularly because his conclusion rested on Plaintiff's failure to seek treatment recommended by other professionals.  *See Bluman v. Plan Adm'r and Trs. for CAN's Integrated Disability Program*, 491 F. App'x 312, 315–16 (3d Cir. 2012) (citing *Stratton*, 363 F.3d at 258 ("A professional disagreement does not amount to an arbitrary refusal to credit.")).  Moreover, while Dr. Hertza found that Plaintiff's cognitive and emotional problems "are directly tied to her medical conditions" (Pl. Mov. Br. at 14 (quoting AR at 3485)), this finding still fails to support that Plaintiff cannot perform "Any Occupation" due to her physical impairments as explained *supra*.

### 2.   Defendant Considered Plaintiff's Diagnoses & Functional Limitations

Next, Plaintiff maintains that Defendant did not consider her diagnosis of chronic fatigue syndrome, fibromyalgia, cognitive dysfunction, and other non-exertional impairments.  (Pl. Mov. Br. at 25–30).  Plaintiff further argues that Defendant cannot require objective or diagnostic proof of her diagnoses under the Plan, and that her conditions are difficult to prove because they often entail "subjective phenomenon such as pain."  (Pl. Mov. Br. at 25–28).

Notwithstanding Plaintiff's assertions, she admits in opposition that "it is not unreasonable [for the Plan] to demand 'objective proof of limitations, not the diagnosis.'"  (Pl. Opp. at 13 (quoting Def. Mov. Br. at 10)); *see Klass v. Reliance Standard Life Ins. Co.*, No. 15-6510, 2017 WL 3741005, at *12 (D.N.J. Aug. 29, 2017) (noting that "courts within the Third Circuit have held that it is not an abuse of discretion to require objective evidence that a condition—including chronic fatigue syndrome and fibromyalgia—is sufficiently disabling to warrant an award of disability benefits") (collecting cases).  On this issue, it is well-settled that "diagnoses alone do not

establish disability." *Krash*, 248 F. Supp. 3d at 615. "The distinction, therefore, is between requiring objective proof that Plaintiff has the particular conditions diagnosed and requiring objective proof that such conditions render her unable to perform the functions of her occupation." *Klass*, 2017 WL 3741005, at *11 (collecting cases in other federal courts that recognize this distinction). Thus, Plaintiff's only argument is that she submitted objective proof of her physical limitations and that Defendant overlooked her evidence. (Pl. Opp. at 13).

Here, Plaintiff sought LTD benefits claiming Total Disability under the Plan, which required her to substantiate her functional limitations with objective evidence, not simply diagnoses. (*See* AR at 10). As explained in Section III.A *supra*, the objective record evidence reflects that Defendant's conclusion—that Plaintiff's physical limitations do not preclude her from performing "Any Occupation" as defined by the Policy—was not arbitrary and capricious. Contrary to Plaintiff's argument, the record shows that consistent with her treating physicians, Dr. Johanning credited Plaintiff's diagnoses of fibromyalgia, chronic pain, chronic fatigue syndrome, thyroid disease, a history of Lyme disease treatments, and depression and anxiety with cognitive minor abnormalities, among various others. (AR at 1645). In addition, Dr. Johanning acknowledged Plaintiff's self-reported pain but found that the medical evidence did not support limitations beyond those notated under sedentary to light work. (AR at 1631–48); *see, e.g.*, *Naphys v. Prudential Ins. Co. of Am.*, No. 16-1450, 2018 WL 4562404, at *11 (D.N.J. Sept. 21, 2018) (citing *Dolfi v. Disability Reinsurance Management Services, Inc.*, 584 F. Supp. 2d 709, 731–35 (M.D. Pa. 2008) (finding that defendant did not abuse its discretion by determining that it could not conclude, based on plaintiff's medical records, that her "pain complaints or other medical conditions would preclude [her] ability to work in a sedentary or light duty work capacity")).[15]

---

[15] The cases Plaintiff cites in support of her position miss the mark. *See, e.g.*, *Steele v. Boeing Co.*, 225 F. App'x 71, 73–75 (3d Cir. 2007) (vacating the district court's decision which found that plaintiff's denial of benefits

This Court's review of the record reflects that neither the Plaintiff's subjective complaints nor the opinions of her treating physicians support her claim of Total Disability. *See Krash*, 723 F. App'x at 110 ("notwithstanding [plaintiff's] subjective complaints, the record contains substantial evidence that [plaintiff] is not totally disabled under the policy"). For example, "[t]o the extent that [Plaintiff] suggest[s] in her brief that her fibromyalgia strengthens her claim," the Court observes that "the record, while noting a diagnosis of fibromyalgia, is devoid of any medical opinion that she is disabled from any occupation due to fibromyalgia" or any of her other diagnoses. *See Tesche v. Cont'l Cas. Co.*, 109 F. App'x 495, 498 n.3 (3d Cir. 2004).

Accordingly, the court cannot conclude that Defendant's decision was "without reason, unsupported by substantial evidence or erroneous as a matter of law." *See Miller*, 632 F.3d at 845 (internal quotation marks omitted). To hold otherwise would require the Court to substitute its judgment for that of the Defendant, which is impermissible. *See Quinlan*, 2015 WL 519430, at *6 (noting that the Court's scope of review is narrow, and it "is not free to substitute its own judgment for that of the defendants in determining eligibility for plan benefits"); *Aristone*, 2016 WL 4265718, at *6 ("Indeed, a decision may be disturbed only if it was unreasonable.").

### 3. Defendant Complied with ERISA's Notice Requirement

Finally, Plaintiff asserts that Defendant skirted ERISA's notice requirement by failing to state the information needed to perfect her claim in its May 25, 2017 denial-of-benefits letter. (Pl. Mov. Br. at 30–31 (first citing *Miller*, 623 F.3d at 852; and then citing 29 C.F.R. § 2560.503–1(g)(1)(iii))). The Court disagrees.

---

determination was "supported by substantial evidence" because plaintiff's fibromyalgia *diagnosis* lacked "significant corresponding pathology" such that "the reporting of pain by itself cannot be the sole determinant in establishing disability"). As explained above, Defendant does not refuse to credit Plaintiff's fibromyalgia diagnosis. Moreover, unlike the present matter, Steele's treating physician noted that his pain was severe to the point where it "precipitated vomiting in the changing room following his physical therapy sessions." *Id.* at 73; (*see, e.g.*, AR at 521 (reflecting Dr. Knod's observation that Plaintiff "did not express any increased complaints of pain following the exam")).

Section 503(1) of ERISA requires that a plan administrator, upon denying a claim for benefits, must provide the claimant with "adequate notice in writing . . . setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant."  29 U.S.C. § 1133(1).   Under the corresponding administrative regulation, an adverse benefits determination shall include "[a] description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary." 29 C.F.R. § 2560.503–1(g)(1)(iii).  Here, Defendant followed that standard.

Defendant's May 25, 2017 letter clearly stated why Plaintiff no longer met the definition of Total Disability under the Policy, and quoted specific Policy definitions and provisions that formed the bases of Defendant's decision.  (AR at 169–70); *see, e.g.*, *Rodriguez*, 2014 WL 347884, at *5 (first citing *Kao v. Aetna Life Ins. Co.*, 647 F. Supp. 2d. 397, 411 (D.N.J. 2009); and then citing *Houser v. Alcoa, Inc. Long Term Disability Plan*, No. 10-0160, 2010 WL 5058310, at *10 (W.D. Pa. Dec. 6, 2010); *Mazur v. Hartford Life & Acc. Co.*, No. 06-1045, 2007 WL 4233400, at *14 (W.D. Pa. Nov. 28, 2007)).   Defendant reviewed Plaintiff's records and summarized the evidence, including the medical opinions of Drs. Lentine, Alkhalaf, Keane, Boss, Liva, and Hertza. (AR at 170–72).  After careful consideration, Defendant concluded that Plaintiff can physically perform her "Regular Occupation" or "Any Occupation" as defined by the Policy.  (AR at 171–72).  Specifically, Defendant stated that Plaintiff's medical records "do not reveal physical findings on examination or consistent positive testing results that would correlate with impairment."  (AR at 172).  Defendant then clearly informed Plaintiff of her right to appeal and advised her that an appeal "should state [] any reasons why you feel the determination is incorrect," including "any written comments, records, or other information pertaining to your claim for benefits."  (AR at 173).

This information was sufficient for Plaintiff to determine how to proceed with a full and fair review on appeal. *See Rodriguez*, 2014 WL 347884, at *6. Indeed, following her denial of benefits, Plaintiff admits that she submitted reports from Drs. Lentine, Wertheimer, Brief, Cameron, Alweiss, and Cong, and physical therapist Ritchie Kim to establish that her disability was not caused or contributed to by a mental or nervous disorder under the Policy's terms. (Pl. Mov. Br. at 31). Thus, unlike *Miller*, Plaintiff cannot claim that the May 25, 2017 denial letter made it "exceedingly difficult for [her] to understand, let alone challenge, the bases for [Defendant's] course of action." *See Quinlan*, 2015 WL 519430, at *10 (first quoting *Miller*, 632 F.3d at 852; and then citing *Connor v. Sedgwick Claims Mgmt. Servs.*, 796 F. Supp. 2d 568 (D.N.J. 2011)). Furthermore, courts in this Circuit have rejected identical arguments where, like here, plaintiffs retain counsel with some familiarity of the evidence required to support a claim for disability during the appeal process. *See, e.g.*, *Rodriguez*, 2014 WL 347884, at *5–6 (citing *Mazur*, 2007 WL 4233400, at *14).

Accordingly, the Defendant's May 25, 2017 denial letter adequately informed Plaintiff of the bases for its decision and gave her sufficient information to lodge an appeal. *See, e.g.*, *id.*; *Quinlan*, 2015 WL 519430, at *10; *Conrad v. Wachovia Grp. Long Term Disability Plan*, No. 08-5416, 2010 WL 3810198, at *9 (D.N.J. Sept. 21, 2010) (finding "nothing 'cryptic' about the meaning of Liberty's letter" (citing *Kao*, 647 F. Supp. 2d at 412)).

## IV.   CONCLUSION

For the foregoing reasons, the Court GRANTS Defendant's motion for summary judgment and DENIES Plaintiff's cross-motion. An appropriate Order accompanies this Opinion.

Dated: March 17, 2022                                      /s/*Esther Salas*
                                                          **Esther Salas, U.S.D.J.**